UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

RICHARD MAILLET,                    :
                                    :
        Plaintiff                   :     No. 3:12-CV-01209
                                    :
    vs.                             :     (Judge Kane)
                                    :
CAROLYN W. COLVIN, ACTING           :
COMMISSIONER OF SOCIAL              :
SECURITY,                           :
                                    :
        Defendant                   :

MEMORANDUM

Background

        The above-captioned action is one seeking review of a
decision of the Commissioner of Social Security ("Commissioner")
denying Plaintiff Richard Maillet's claim for social security
disability insurance benefits.

        Disability insurance benefits are paid to an individual
if that individual is disabled and "insured," that is, the
individual has worked long enough and paid social security taxes.
The last date that a claimant meets the requirements of being
insured is commonly referred to as the "date last insured."  It is
undisputed that Maillet met the insured status requirements of the
Social Security Act through September 30, 2010.  Tr. 13, 15, 30
and 104.[1]  In order to establish entitlement to disability
insurance benefits Maillet was required to establish that he

_____

1.  References to "Tr.__" are to pages of the administrative
record filed by the Defendant as part of the Answer on August 30,
2012.

suffered from a disability on or before that date.  42 U.S.C.
§423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a)(2008); see Matullo
v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

Maillet protectively filed[2] his application for
disability insurance benefits on March 13, 2009. Tr. 13, 32, 95
and 120.[3]  The application was initially denied by the Bureau of
Disability Determination[4] on August 13, 2009. Tr. 13 and 97-101.
On August 26, 2009, Maillet requested a hearing before an
administrative law judge. Tr. 13 and 103-104.  After over 13
months had passed, a hearing was held on October 5, 2010. Tr. 13-
25.  Maillet was represented by counsel at the hearing. Id.  On
November 1, 2010, the administrative law judge issued a decision
denying Maillet's application. Tr. 13-25.  As will be explained in
more detail infra the administrative law judge found that Maillet
was able to perform a limited range of light work and identified
three positions that Maillet could perform: a ticket seller,
counter clerk, and hand garment trimmer. Tr. 24 and 69.  The

_____

2.  Protective filing is a term for the first time an individual
contacts the Social Security Administration to file a claim for
benefits.  A protective filing date allows an individual to have
an earlier application date than the date the application is
actually signed.

3.  A review of the administrative record does not reveal the
actual application but documents indicating that one was filed.

4.  The Bureau of Disability Determination is an agency of the
state which initially evaluates applications for disability
insurance benefits on behalf of the Social Security
Administration.  Tr. 98.

vocational expert described those positions as "light duty" but "primarily [in] seated positions, with the exception of the counter clerk." Tr. 69.  On December 7, 2010, Maillet filed a request for review with the Appeals Council and after over 16 months had elapsed the Appeals Council on April 25, 2012, concluded that there was no basis upon which to grant Maillet's request for review. Tr. 1-9.  Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Maillet then filed a complaint in this court on June 26, 2012.  Supporting and opposing briefs were submitted and the appeal[5] became ripe for disposition on December 20, 2012, when Maillet filed a reply brief.

Maillet was born in the United States on February 7, 1972, and at all times relevant to this matter was considered a "younger individual"[6] whose age would not seriously impact his ability to adjust to other work. 20 C.F.R. § 404.1563(c). Tr. 95-96, 209 and 279.

Maillet who withdrew from school after failing the 12th grade and who obtained a General Equivalency Diploma (GED) in 1991 can  read, write, speak and understand the English language and

---

5.  Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

6.  The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

perform basic mathematical functions such as paying bills,
counting change, handling a savings account and using a checkbook
and money orders.  Tr. 45, 141, 149, 183, 196 and 279.
During his elementary and secondary schooling, Maillet attended
regular education classes. Tr. 149.  After obtaining a GED Maillet
did not complete "any type of special job training, trade or
vocational school." Id.

Maillet's work history covers 17 years and at least 10
different employers. Tr.  122-126 and 131.  The records of the
Social Security Administration reveal that Maillet had earnings in
the years 1989 through 2001 and 2005 through 2008. Tr. 131.
Maillet's annual earnings range from a low of $230.00 in 1989 to a
high of $19,313.50 in 1998. Id.  Maillet's total earnings during
those 17 years were $142,982.86. Id.

Maillet has past relevant employment[7] as (1) an
automobile detailer which was described as unskilled, medium work
by a vocational expert; (2) a concrete laborer described as semi-
skilled, heavy work; (3) a dishwasher described as unskilled,
medium work; (4) a floor cleaner described as unskilled, medium
work; (5) a trash hauler described as unskilled, very heavy work;
(6) a retail stock clerk described as semi-skilled, heavy work;
(7) a municipal maintenance worker described as skilled, heavy

---

7.  Past relevant employment in the present case means work
performed by Maillet during the 15 years prior to the date his
claim for disability was adjudicated by the Commissioner.  20
C.F.R. §§ 404.1560 and 404.1565.

work; (8) a house cleaner described as unskilled, medium work; and
(9) a pizza delivery driver described as unskilled, medium work.
Tr. 64-66.

In a document filed with the Social Security
Administration, Maillet stated that (1) from the spring of 1993 to
the spring of 1994 he worked as stock clerk 8 hours per day, 4
days per week; (2) from the spring of 1994 to the fall of 1995 as
an automobile detailer 8 hours per day, 5 days per week; (3) from
the summer of 1995 to the fall of 1996 as a dishwasher 7 hours per
day, 4 days per week; (4) from the fall of 1996 to the spring of
2000 as a concrete worker 9 hours per day, 5 days per week; (5)
from the summer of 2000 to the summer of 2001 as floor cleaner 10
hours per day, 4 days per week; and (6) from the spring of 2005 to
June, 2008, as a house cleaner 7 hours per day, 4 days per week.
Tr. 143

Maillet claims that he became disabled on June 5, 2008,
because of both physical and mental impairments. Tr. 142. Maillet
identified depression as his mental health impairment and back
pain, involving degenerative disc disease and spinal and foraminal
stenosis, as his physical impairment. Id. In a "Function Report
- Adult" filed with the Social Security Administration, Maillet
when asked to check items which are affected by his illnesses or
conditions checked the following: lifting, squatting, bending,
standing, reaching, walking, sitting, kneeling, stair climbing,
memory, completing tasks, concentration and getting along with

others. Tr. 185.  At the administrative hearing when asked to described the conditions that prevented him from working, Maillet stated that he suffers from lower back pain, right hip pain, and that his left leg "goes out." Tr. 47-48.  He also stated that he sleeps "a lot" and has "to lay down every couple hours" because of the pain and that his condition worsened over time. Tr. 42-44, 47 and 54-55.  Maillet last worked on June 5, 2008. Tr. 142.

For the reasons set forth below we will remand the case to the Commissioner for further proceedings.

**Standard of Review**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter

v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S.

474, 488 (1971).  A single piece of evidence is not substantial

evidence if the Commissioner ignores countervailing evidence or

fails to resolve a conflict created by the evidence.  <u>Mason</u>, 994

F.2d at 1064.  The Commissioner must indicate which evidence was

accepted, which evidence was rejected, and the reasons for

rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642

F.2d at 706-707.  Therefore, a court reviewing the decision of the

Commissioner must scrutinize the record as a whole.  <u>Smith v.</u>

<u>Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v.</u>

<u>Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

**Sequential Evaluation Process**

To receive disability benefits, the plaintiff must

demonstrate an "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).

Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment or
> impairments are of such severity that he is not only
> unable to do his previous work but cannot, considering
> his age, education, and work experience, engage in any
> other kind of substantial gainful work which exists in
> the national economy, regardless of whether such work
> exists in the immediate area in which he lives, or
> whether a specific job vacancy exists for him, or
> whether he would be hired if he applied for work.  For
> purposes of the preceding sentence (with respect to any
> individual), "work which exists in the national economy"
> means work which exists in significant numbers either in

the region where such individual lives or in several
regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in
evaluating disability insurance and supplemental security income
claims.  See 20 C.F.R. §404.1520; Poulos, 474 F.3d at 91-92.  This
process requires the Commissioner to consider, in sequence,
whether a claimant (1) is engaging in substantial gainful
activity,[8] (2) has an impairment that is severe or a combination
of impairments that is severe,[9] (3) has an impairment or

---

8.  If the claimant is engaging in substantial gainful activity,
the claimant is not disabled and the sequential evaluation
proceeds no further. Substantial gainful activity is work that
"involves doing significant and productive physical or mental
duties" and "is done (or intended) for pay or profit."  20 C.F.R.
§ 404.1510.

9.  The determination of whether a claimant has any severe
impairments, at step two of the sequential evaluation process, is
a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no
impairment or combination of impairments which significantly
limits the claimant's physical or mental abilities to perform
basic work activities, the claimant is "not disabled" and the
evaluation process ends at step two. Id.  If a claimant has any
severe impairments, the evaluation process continues. 20 C.F.R. §
404.1520(d)-(g). Furthermore, all medically determinable
impairments, severe and non-severe, are considered in the
subsequent steps of the sequential evaluation process. 20 C.F.R.
§§ 404.1523 and 404.1545(a)(2). An impairment significantly
limits a claimant's physical or mental abilities when its effect
on the claimant to perform basic work activities is more than
slight or minimal. Basic work activities include the ability to
walk, stand, sit, lift, carry, push, pull, reach, climb, crawl,
and handle. 20 C.F.R. § 404.1545(b).  An individual's basic
mental or non-exertional abilities include the ability to
understand, carry out and remember simple instructions, and
respond appropriately to supervision, coworkers and work
pressures. 20 C.F.R. § 1545(c).

(continued...)

combination of impairments that meets or equals the requirements of a listed impairment,[10] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[11]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule.  The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. § 404.1545; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

---

9.  (...continued)

10.  If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

11.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

**Medical Records**

Before we address the administrative law judge's decision and the arguments of counsel, we will review in detail Maillet's medical records.

Maillet well prior to the alleged onset date of June 5, 2008, commenced treatment with Gursham Singh, M.D., located in Mahanoy City, Pennsylvania, for complaints of low back pain. Tr. 201-202 and 254.

On or about August 10, 2006, Dr. Singh referred Maillet to Pottsville Hospital and Warne Clinic for a series of x-rays of the lumbosacral spine. Tr. 202. Those x-rays revealed "[m]inimal central compression of the endplates of L2;[12] otherwise negative

---

12.   The spine (vertebral column) from the head to the tailbone is divided into five regions: the cervical (consisting of 7 vertebrae, C1-C7 in descending order), the thoracic (12 vertebrae, T1-T12 in descending order), the lumbar (5 vertebrae, L1-L5 in descending order), the sacrum (5 fused vertebrae, S1-S5 in descending order) and the coccyx (4 fused vertebrae). Other than the first two vertebrae of the cervical spine (C1 and C2), the vertebrae of the cervical, thoracic and lumbar regions are similarly shaped.
   A vertebra consists of several elements, including  the vertebral body (which is the anterior portion of the vertebra), pedicles, laminae and the transverse processes.  The vertebral body is the largest part of the vertebra and is somewhat oval shaped. The endplates are the top and bottom portions of a vertebral body that come in direct contact with the intervertebral discs.
   The intervertebral discs (made of cartilage) are the cushions (shock absorbers) between the bony vertebral bodies that make up the spinal column. Each disc is made of a tough outer layer and an inner core composed of a gelatin-like substance. The outer layer of an intervertebral disc is called the annulus fibrosus and the inner core the nucleus pulposus. Jill PG Urban and Sally Roberts, Degeneration of the intervertebral disc,

(continued...)

study." Id.  A second set of x-rays of Maillet's lumbosacral spine was performed on June 13, 2007 based on a request from Dr. Singh. Tr. 201.  Those x-rays revealed "[n]o significant interval change" and "[n]o significant disc degeneration or osteoarthritic changes." Id.

From October 19, 2006 through June 5, 2008, Maillet had twelve appointments with Dr. Singh where Maillet complained of low back pain.[13] Tr. 250-254. The treatment notes of those

---

12.  (...continued)
PublicMedCentral,http://www.ncbi.nlm.nih.
gov/pmc/articles/PMC165040/(Last accessed February 4, 2014); see also Herniated Intervertebral Disc Disease, Columbia University Medical Center, Department of Neurology, http://www.columbianeuro surgery.org/conditions/herniated-intervertebral-disc-disease/ (Last accessed February 4, 2014).
    Degenerative disc disease is the wear and tear and breakdown of the intervertebral discs as a person grows older.  It is a process that can result from the dehydration of the discs as well as an injury to the spine. The breakdown of the intervertebral discs can result in discs bulging, protruding or herniating as well as the inner gelatin-like core of the disc extruding outside the annulus fibrosus. These conditions sometimes obstruct the openings (foramen) along the spine through which nerve roots exit. This condition is known as neural foraminal stenosis. They can also result in a narrowing of the spinal canal or spinal stenosis. Such bulges, protrusions and herniations if they contact nerve tissue can cause pain.
    Degenerative joint disease (or osteoarthritis) is a breakdown of the cartilage between joints.  In the spine there are facet joints which are in the back of the spine and act like hinges. There are two superior (top) and two inferior (bottom) portions to each facet joint called the superior and inferior articular processes. These joints are covered with cartilage and the wear and tear of these joint is known as facet arthropathy (arthritis). This wear and tear of the facet joints result in loss of cartilage and can cause pain.

13.  Specfically, Maillet had appointments with Dr. Singh on October 19, 2006; January 25, May 17, June 28, August 30, October 25 and December 12, 2007; and January 17, February 21, March 24,
(continued...)

appointments are only partially legible and do not contain any abnormal objective physical examination findings. Id. Dr. Singh did record Maillet's blood pressure and weight.[14] Id. We can discern that Dr. Singh's diagnostic impression during that time was that Maillet suffered from degenerative disc or joint disease of the back and Dr. Singh prescribed the narcotic pain medication Vicodin and the muscle relaxant Soma. Id. At the appointment on June 5, 2008, which is Maillet's alleged disability onset date, Maillet told Dr. Singh that he "pulled" his back. Tr. 250.

From June 10 to 12, 2008, Maillet was hospitalized for intractable back pain not relieved with medication at Bon Secours Community Hospital, located in Port Jarvis, New York. Tr. 208-231. An MRI of the lumbar spine revealed multilevel degenerative disc disease with variable central and neural foraminal stenosis and a disk protrusion at the L5/S1 level of the lumbosacral spine. Tr. 210 and 239. It also revealed mild encroachment upon the right neural foramen at the L4/L5 level. Id. A hip x-ray was negative. Tr. 210 and 235. A bone scan was also negative. Tr. 210 and 236. An x-ray of the lumbar spine revealed no fracture or subluxation. Tr. 210 and 238. An MRI of the thoracic spine showed mild anterior

---

13.   (...continued)
May 5 and June 5, 2008.

14.   Maillet's blood pressure was consistently within normal limits and his weight ranged from 170 to 183 pounds.  Dr. Singh also appears to report normal findings (by way of check marks) for Maillet's head, ears, eyes, noise, throat, neck, heart, lungs and abdomen.

wedging of the vertebra at the T6 level with signal abnormality suggestive of an hemangioma.[15] Tr. 210 and 237.  On June 12th Maillet was walking around and feeling much better. Tr. 210.  He was discharged with a diagnosis of spinal stenosis[16] causing back pain and prescribed Decadron, an anti-inflammatory corticosteroid medication, and Vicodin. Tr. 210 and 241.

From June 19, 2008, through April 20, 2009, Maillet had eleven appointments with Dr. Singh.[17] Tr. 244-249. Maillet continued to complain of back pain and was treated with pain medications. Id.  Dr. Singh's treatment notes are only partially legible and contain no abnormal objective physical examination findings. Id.  Dr. Singh did record Maillet's blood pressure and

---

15.  "A spinal hemangioma is a primary, benign tumor most common in the thoracic and lumbar spine. This type of tumor typically affects the vertebral body, but also can affect muscles. The tumor has few symptoms, and is often found on examination for another condition." Scoliosis & Spine Associates, Spinal Tumors, http://www.scoliosisassociates.com/subject.php?pn=spinal-tumors-0 12 (Last accessed January 29, 2014).

16.  "Spinal stenosis is a narrowing of the open spaces within your spine, which can put pressure on your spinal cord and the nerves that travel through the spine. Spinal stenosis occurs most often in the neck and lower back.  While some people have no signs or symptoms, spinal stenosis can cause pain, numbness, muscle weakness, and problems with bladder or bowel function." Spinal Stenosis, Definition, Mayo Clinic staff, Mayoclinic.com, http://www.mayoclinic.org/diseases-conditions/seo/basics/ definition/con-20036105 (Last accessed February 4, 2014).

17.  Specfically, Maillet had appointments with Dr. Singh on June 19, July 8, August 12, September 11, October 14, November 13 and December 15, 2008; and January 19, February 16, March 16 and April 20, 2009.

weight.[18]  Dr. Singh's diagnostic impression during that time was that Maillet suffered from degenerative disc or joint disease of the back and Dr. Singh prescribed the narcotic pain medication Vicodin. Id.

The record does not reflect whether after his April 20, 2009, appointment that Maillet returned to Dr. Singh for treatment and the record does not contain an assessment from Dr. Singh regarding Maillet's work-related physical or mental functional limitations.

On June 8, 2009, Maillet was evaluated by Mian Shahid, M.D., Palmerton Hospital, Palmerton, Pennsylvania, on behalf of the Bureau of Disability Determination. Tr. 258-265. After conducting a clinical interview and a physical examination, including an assessment of Maillet's range of motion of his shoulders, elbows, wrists, knees, hips, and cervical and lumbar spine, Dr. Shahid's diagnostic assessment was that Maillet suffered from (1) severe chronic low back pain syndrome with L5 and S1 radiculopathy[19] and paraparesis (or a partial paralysis) of

_____

18.  Maillet's blood pressure was consistently within normal limits and his weight ranged from 168 to 181 pounds.  Dr. Singh also appears to report normal findings (by way of check marks) for Maillet's head, ears, eyes, noise, throat, neck, heart, lungs and abdomen.

19.  Radiculopathy is a condition where one or more nerves or nerve roots are affected and do not work properly. The nerve roots are branches of the spinal cord. They carry signals to the rest of the body at each level along the spine. The nerve roots exit through holes (foramen) in the bone of spine on the left and

(continued...)

both lower extremities; (2) an abnormal gait caused by chronic low back pain syndrome; and (3) cervical osteoarthritis. Tr. 263.

A physical examination of Maillet revealed that side-to-side movements of Maillet's neck were markedly limited but that flexion and extension were well preserved; Maillet's power in the lower extremities was severely impaired in the knee flexors and in the foot extensors and flexors; Maillet's deep tendon reflexes were diminished bilaterally at all levels; his gait was abnormal; and his range of motion in the lumbosacral spine was severely limited. Tr. 262. Dr. Shahid noted that Maillet had to use "his arm to lift his leg to straighten it out on [the] examining table," "he dragged his right leg without a cane," he could not bend forward more than 5 degrees, and his "side-to-side movements of the lumbosacral spine [were] severely limited[.]" Id.

Dr. Shahid also completed a Medical Source Statement of Maillet's ability to perform work-related physical activities. Tr. 264-265. That document requested that Dr. Shahid "assess [Maillet's] ability to engage in full-time employment in a regular work setting." Tr. 264. Dr. Shahid indicated that Maillet was (1) unable to lift more than five pounds; (2) could not stand for more than 5 minutes or walk more than thirty feet; (3) could not sit

19. (...continued)
the right. Radiculopathy can be the result of a disc herniation or an injury causing foraminal impingement of an exiting nerve (the narrowing of the channel through which a nerve root passes). See, generally, Radiculopathy, MedicineNet.com, http://www.medicinenet.com/radiculopathy/article.htm (Last accessed February 3, 2014).

for more than 10 minutes; (4) could not push/pull more than 10 pounds; and (5) could never bend, kneel, stoop, crouch, balance, climb or reach. Tr. 264-265.

On July 9, 2010, Louis Tedesco, M.D., reviewed on behalf of the Bureau of Disability Determination Maillet's medical records and Dr. Shahid's examination report, range of motion chart and medical source statement, and concluded that Dr. Shahid's assessment was an overestimate of the severity of Maillet's functional restrictions. Tr. 266-272. Dr. Tedesco opined that Maillet was capable of performing light exertional work activity and had the ability to stand and walk up to three hours during an 8-hour workday and sit about 6 hours. Tr. 267. Dr. Tedesco did not examine Maillet. Id.

On August 10, 2009, Frank James Vita, Ph.D., a psychologist, performed an evaluation of Maillet on behalf of the Bureau of Disability Determination. Tr. 276-281. Dr. Vita found that Maillet suffered from major depressive disorder and moderate limitations in several mental work-related functional abilities, including the ability to carry out simple instructions, make judgments on simple work-related decisions and interact appropriately with the public, supervisors and co-workers. Tr. 276 and 281.

On August 13, 2009, John D. Chiampi, Ph.D., a psychologist, reviewed Maillet's medical records on behalf of the

Bureau of Disability Determination and concluded that Maillet did
not have a medically determinable mental impairment.  Tr. 287-299.

     The next medical treatment notes that we encounter in
the administrative record is with respect to an appointment
Maillet had with Joseph McGinley, D.O., on April 1, 2010. Tr. 314-
316. At that appointment Maillet complained of low back pain and
depression. Tr. 314. Maillet reported that the "discomfort" was
"most prominent in the lower lumbar spine" and that the pain
radiated "to the left posterior thigh." Id.  Maillet characterized
the pain as "intermittent, severe and sharp." Id.  Maillet
reported a "moderate degree of depression" which had "been present
for the past 5 years." Id.  It was noted that Maillet was not
taking any antidepressant medications and that Maillet denied any
thoughts of suicide. Id.  A physical examination of Maillet
performed by Dr. McGinley revealed that Maillet's neck was supple
with full range of motion; and Maillet had a normal gait, normal
deep tendon reflexes at the knees and ankles, grossly normal
muscle tone and strength, and full, painless range of motion of
all major muscle groups and joints. Tr. 315. However, it was also
stated that "pain [was] elicited over the left and right lumbar
paraspinal muscles;" Maillet's muscle strength was "2/5 left and
3/5 right quadriceps" and 2/5 left, 3/5 right iliopsoas;"[20] he had

---

20.  A 2/5 muscle strength rating is given when the muscles are
able to contract but cannot move the body part fully against
gravity. A 3/5 rating is given when the muscles are able to fully
contract and you are able to move the body part through its full
(continued...)

limited range of motion with respect to extension, flexion, left lateral bending, right lateral bending, left rotation, and right rotation; and he had positive straight leg raising tests bilaterally.[21] Id.  Dr. McGinley's diagnostic assessment was that Maillet suffered from low back pain, depression and essential hypertension, benign.  Id.  Dr. McGinley prescribed the psychotropic drug Zoloft; ordered an MRI of the lumbar spine,

---

20.  (...continued)
range of motion against gravity but when resistance is applied manually you are unable to maintain the muscle contraction. Muscle Strength Measurement, Physical Therapy, http://physical therapy.about.com/od/orthopedicsandpt/a/strengthmeasurement.htm (Last accessed February 3, 2014). The quadriceps is a large muscle group in the thigh and the iliopsoas muscle is one of the largest and most powerful hip flexors responsible for movement of the leg and trunk. Dr. McGinley's finding that Maillet had 2/5 and 3/5 muscle strength in the left and right quadriceps and iliopsoas, respectively, is consistent with Dr. Shahid's observation of Maillet having to use his arm to lift his leg to straighten it out on the examination table and dragging his right leg without a cane. Tr. 262. The problem observed with Maillet's right leg is also consistent with the results of the MRI performed during Maillet's June 10 to 12, 2008, hospitalization which revealed right neural foramen encroachment at the L4/L5 level. Tr. 239.  The L5 nerves control the muscles that raise the foot and big toe and impingement may result in muscle weakness. See Strength of Individual Muscle Groups, Neuroexam.com,http:// www.neuroexam.com/neuroexam/content.php?p=29 (Last accessed February 3, 2014). The L4 nerve is also involved in movement of the lower extremities. Id.

21.  The straight leg raise test is done to determine whether a patient with low back pain has an underlying herniated disc.  The patient, either lying or sitting with the knee straight, has his or her leg lifted.  The test is positive if pain is produced between 30 and 70 degrees. Niccola V. Hawkinson, DNP, RN, Testing for Herniated Discs: Straight Leg Raise, SpineUniverse, http://www.spineuniverse.com/experts/testing-herniated -discs-straight-leg-raise (Last accessed February 3, 2014).

blood tests, and a urinalysis; and scheduled a two-week follow-up appointment. Id.

The follow-up appointment occurred on April 16, 2010, and at that appointment Maillet continued to complain of low back pain and moderate depression. Tr. 317.  There was no change in Dr. McGinley's physical examination findings and his diagnostic assessment was the same. Tr. 318. It was reported that Maillet's current medications were Zoloft, Soma, Motrin and Vicodin. Id. Dr. McGinley noted that Maillet's insurance company denied authorization for the MRI which had been ordered. Tr. 317.

Maillet had appointments with Dr. McGinley on May 3, June 3 and 17, and July 15, 2010.  A review of the records of those appointments reveals that there was no change in Dr. McGinley's physical examination findings and his diagnostic assessment was the same. Tr. 320-327 and 336-338. However, Maillet did report an improvement in his depression. Id.  On June 3rd Maillet only reported a "mild degree of depression" and on June 17th stated that he had a "40% improvement with Zoloft." Tr. 323 and 326.

On July 21, 2010, Maillet underwent a psychiatric evaluation at The ReDCo Group Behavioral Health Services. Tr. 304-307.  Maillet's chief complaint was depression for 4-5 years which had become worse in the last 2 years. Tr. 304.  Maillet reported that he had no energy or motivation, daily crying spells and thoughts of suicide every other day for a few minutes. Id.  He

also reported what appears to be auditory hallucinations (i.e.,
"hearing stuff coming from outside the window") and he was
"worrying a lot."  A mental status examination of Maillet by the
psychiatrist[22] revealed that Maillet was anxious, depressed,
tearful and that Maillet had a difficult time expressing himself.
Tr. 305.  The psychiatrist noted that Maillet had severe
depression which was affecting his cognition; he had poor
concentration and memory problems and an inability to focus and
make decisions and he exhibited confusion. Id.  The psychiatrist
also indicated that Maillet had questionable auditory and visual
hallucinations but no delusions and that he was fidgety. Id.  The
diagnostic assessment was that Maillet suffered from major
depressive disorder, severe, chronic and he was given a current
Global Assessment of Functioning (GAF) score of 25 and a highest
GAF score in the last year of 30.[23] Tr. 306.  With respect to a

---

22.  The signature of the psychiatrist is illegible.

23.  The GAF score allows a clinician to indicate his judgment of
a person's overall psychological, social and occupational
functioning, in order to assess the person's mental health
illness.  *Diagnostic and Statistical Manual of Mental Disorders*
3-32 (4th ed. 1994). A GAF score is set within a particular range
if either the symptom severity or the level of functioning falls
within that range. Id. The score is useful in planning treatment
and predicting outcomes. Id.  The GAF rating is the single value
that best reflects the individual's overall functioning at the
time of examination.  The rating, however, has two components:
(1) symptom severity and (2) social and occupational functioning.
The GAF is within a particular range if either the symptom
severity or the social and occupational level of functioning
falls within that range.  When the individual's symptom severity
and functioning level are discordant, the GAF rating reflects the
                                              (continued...)

treatment plan, the psychiatrist stated that Maillet needed inpatient psychiatric care and that Maillet agreed to be hospitalized. Id.

On July 25, 2010, at 8:30 p.m.,[24] Maillet visited the emergency department at Gnaden Huetten Memorial Hospital, located in Lehighton, Pennsylvania, for a voluntary psychiatric commitment (a 201 commitment). Tr. 307-308.  The behavioral health intake form indicates that Maillet was having, inter alia, passive suicidal thoughts, excessive sleep, decrease in appetite, mania, agitation, poor concentration, and confusion. Tr. 307. The diagnostic assessment by the attending psychiatrist was that Maillet suffered from major depressive disorder and he gave Maillet a GAF score of 25. Tr. 308.

Maillet was admitted to Gnaden Huetten Memorial Hospital and from July 26, 2010 to August 2, 2010, he underwent inpatient

---

23.  (...continued)
worse of the two.  Thus, a suicidal patient who is gainfully employed would have a GAF rating below 20.  A GAF score of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas.  A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas,  such as work or school, family relations, judgment, thinking or mood. Id.  A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning.  Id.  A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id. A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships. Id

24.  The record uses military time, i.e., 20:30 hours.

psychiatric care. Tr. 307-313.  A clinical interview was performed on July 26th by Uchenna C. Uzoukwu, M.D., a psychiatrist, who noted that Maillet had a 10-year history of alcohol abuse but that Maillet reported that he had been sober for 6 ½ years. Tr. 309. During the mental status examination Dr. Uzoukwu observed that Maillet appeared older than his stated age with good hygiene and grooming; he was tearful throughout the interview; his speech was soft, spontaneous and goal directed; his mood was depressed and his affect congruent to mood; he denied auditory and visual hallucinations and delusions; he reported that he was no longer feeling suicidal but felt hopeless and helpless; he had no homicidal ideations; his thought process was normal and goal directed; he was alert and oriented to person, place and time with fair concentration and attention; he exhibited poor impulse control; and his judgment and insight were limited. Id.  Dr. Uzoukwu's diagnostic assessment was that Maillet suffered from major depressive disorder, single episode, severe, and alcohol dependence in remission, and gave Maillet a GAF score of 10 to 15. Tr. 310.  Maillet was referred to the Adult Behavior Health Unit for depression and suicidal ideation and the estimated length of stay was 7 to 10 days. Id.

During his stay in the psychiatric unit, a physical examination was performed on July 27th by Robert G. Madeira, M.D. Tr. 311-312.  The results of that examination were essentially normal. Tr. 311.  Although there were no abnormal objective

23

findings recorded, Dr. Madeira's diagnostic assessment included chronic low back pain. Tr. 312.

At discharge on August 2nd the diagnostic assessment was that Maillet suffered from major depressive disorder and he was given a GAF score of 50, representing the high end of the range of serious symptomatology. Tr. 313.  The discharge summary reports that during his stay Maillet's dose of Zoloft was decreased from 100 mg daily to 50 mg daily and he was started on Wellbutrin which was gradually increased to 150 mg twice daily. Tr. 313.  Maillet responded well to this medication change and at the time of discharge "he no longer [was feeling] hopeless and helpless" and he was "denying any suicidal ideation." Id.  His medications at discharge were Zoloft and Wellbutrin and he was advised to continue outpatient treatment for medication management and individual psychotherapy. Id.

On August 6, 2010, Maillet had an appointment with Dr. McGinley at which Maillet complained of depression. Tr. 334-335. However, Maillet denied anxiety and feelings of stress or suicidal thoughts. Tr. 334.  No abnormal physical examination or mental status findings were recorded by Dr. McGinley. Tr. 335.  Dr. McGinley's diagnostic assessment was depression and he listed Maillet's current medication as Zoloft and recommended no change to his current medication regimen. Id.

On August 11 and September 8, 2010, Maillet had medication reviews at The ReDCo Behavioral Health Services. Tr.

302-303.  On August 11th it was noted that Maillet had a partial response to treatment and his medications were kept the same. Tr. 303.  The diagnostic assessment was the same but he was given a GAF score of 55, representing moderate symptomatology. Id.  On September 8th the diagnostic assessment was the same and he was given a GAF score of 55; it was again noted that he had a partial response to treatment and Maillet's dosage of Zoloft was increased to 100 mg. Tr. 302.

On September 13 and 27, 2010, Maillet had appointments with Dr. McGinley regarding low back pain. Tr. 328-333.  A review of the records of those appointments reveals that there was no change in Dr. McGinley's physical examination findings and his diagnostic assessment as compared to the physical examination findings and diagnosis initially recorded on April 1, 2010. Id. At the September 13, 2010, appointment Maillet reported that his symptoms were worse and that the "vicodin [was] only helping '30%'." Tr. 328. However, at the appointment on September 27th Maillet stated that his symptoms had improved since the last visit. Tr. 331.

Also, on September 27, 2010, Dr. McGinley completed a Medical Source Statement on which he indicated that Maillet could not perform a full-eight hour workday. Tr. 340-343. Dr. McGinley opined that Maillet could frequently lift/carry less than ten pounds; stand/walk less than two hours; sit less than six hours; and had limited ability to push/pull with his lower extremities

because of severe chronic low back pain syndrome with radiculopathy in both lower extremities and cervical arthritis. Tr. 341.  Dr. McGinley further stated that Maillet had limited ability to reach because of cervical neck pain and should avoid extremes of humidity, temperature and vibration because those conditions would increase his pain. Tr. 342.

After the administrative law judge denied Maillet's claim, Maillet submitted additional medical records to the Appeals Council. Tr. 346-351 and 354-364.  On September 8, October 6, November 3 and December 1, 2010, Maillet had medication reviews at The ReDCo Group Behavioral Health Services. Tr. 348-351.  On each occasion the diagnosis reported was major depressive disorder, his response to treatment was noted to be fair, and it was recommended that he continue receiving the psychotropic medications Wellbutrin and Zoloft and psychotherapy. Id.  On September 8, October 6 and November 3, 2010, he was given a GAF score of 55, representing moderate symptomatology, and the record of the December 1, 2010, medication review does not report a GAF score. Id.

At an appointment with Dr. McGinley on February 10, 2011, Maillet only reported "a mild degree of depression" and he denied suicidal thoughts. Tr. 363-364.  No abnormal physical examination findings were recorded by Dr. McGinley and a mental status examination revealed that Maillet was alert and oriented to person, place and time, he had an appropriate affect and demeanor and he had good insight and judgment. Tr. 364.

On February 23 and March 23, 2011, Maillet had medication reviews at The ReDCo Group Behavioral Health Services. Tr. 346-347. On February 23rd it was reported that Maillet had an inadequate response to treatment, he was sleeping excessively up to 12 hours and he reported that "he was not able to have fun or enjoy [illegible]." Tr. 347.  However, he had no suicidal or homicidal thoughts, or auditory or visual hallucinations or delusions. Id.  Maillet was given a GAF score of 50. Id.  It was noted that his current medications were Wellbutrin and Zoloft. Id. An adjustment was made to Maillet's medications and at the medication review on March 23rd Maillet was feeling better and he was "more able to have fun and enjoy [illegible]." Tr. 346.  On March 23rd Maillet's current medications were noted to be Lamictal[25] and Wellbutrin and he was given a GAF score of 55. Maillet's response to treatment was noted to be "fair/partial" and it was recommended that his dosage of Lamictal be increased and that he continue taking the same amount of Wellbutrin and continue with psychotherapy. Tr. 346.

On April 8, 14 and 28, 2011, Maillet had appointments with Dr. McGinley regarding low back pain. Tr. 354-362.  A review of the records of those appointments reveals that there was no change in Dr. McGinley's physical examination findings and his

---

25.  Lamictal is an anti-epileptic medication which is also used to delay mood episodes in adults with bipolar disorder. Lamictal, Drugs.com, http://www.drugs.com/lamictal.html (Last accessed February 3, 2014).

diagnostic assessment as compared to those initially recorded on April 1, 2010. Id. On April 8th Maillet reported that his symptoms were unchanged since the last visit. Tr. 360.  On April 14th he again stated that his symptoms had not changed since the last visit. Tr. 357.  However, on April 28th Maillet stated that his symptoms had improved since the last visit and when Dr. McGinley reviewed Maillet's systems,[26] Maillet denied any paresthesias (pins or needles or tingling) or weakness. Tr. 354.

**Discussion**

    The administrative record in this case is 364 pages in length consisting, inter alia, of vocational and medical records. We have thoroughly reviewed that record.  Maillet argues, inter alia, that the administrative law judge failed to appropriately consider the opinions of treating and examining physicians, and improperly substituted her own lay judgment for that of the medical experts.  We find substantial merit in those arguments. The administrative law judge committed several legal and factual errors which require that the case be remanded to the Commissioner for further proceedings. Those errors will be detailed as we review the decision of the administrative law judge.

    The administrative law judge at step one of the sequential evaluation process found that Maillet did not engage in

---

26.  "The review of systems (or symptoms) is a list of questions, arranged by organ system, designed to uncover dysfunction and disease." A Practical Guide to Clinical Medicine, University of California, School of Medicine, San Diego, http://meded.ucsd.edu/clinicalmed/ros.htm (Last accessed February 4, 2014).

substantial gainful work activity during the period from his
alleged onset date of June 5, 2008, through his date last insured
of September 30, 2010. Tr. 15.

Step two is the first point where the administrative law
judge erred.  At step two of the sequential evaluation process,
the administrative law judge found that Maillet had the following
severe impairments: "degenerative disc disease of the lumbar spine
with possible lower extremity radiation, complaints of hip pain
despite negative imaging, and situational depression[.]" Tr. 16.
The administrative law judge further found that Maillet's high
blood pressure and "mild wedging of the thoracic spine with
possible indications of hemangioma" were non-severe impairments.
Id.  However, the administrative judge did not make a definitive
determination as to whether or not Maillet's lower extremity
radiculopathy and partial paralysis as well as cervical arthritis
were medically determinable severe or non-severe impairments.  Dr.
Shahid found that Maillet suffered from severe chronic low back
pain syndrome with L5 and S1 radiculopathy and partial paralysis
of both lower extremities and cervical arthritis.  Tr. 263.  Dr.
McGinley also found that Maillet suffered from radiculopathy in
both lower extremities and cervical arthritis. Tr. 342.

The Social Security regulations contemplate the
administrative law judge considering whether there are any
medically determinable impairments and then when setting a
claimant's residual functional capacity considering the symptoms

29

of both medically determinable severe and non-severe impairments.
20 C.F.R. § 404.1529.   The determination of whether a claimant has
any severe impairments, at step two of the sequential evaluation
process, is a threshold test. 20 C.F.R. § 404.1520(c). If a
claimant has no impairment or combination of impairments which
significantly limit the claimant's physical or mental abilities to
perform basic work activities, the claimant is "not disabled" and
the evaluation process ends at step two. Id.   If a claimant has
any severe impairments, the evaluation process continues.   20
C.F.R. § 404.1520(d)-(g).   A failure to find a medical condition
severe at step two will not render a decision defective if some
other medical condition was found severe at step two.   However,
all of the medically determinable impairments both severe and non-
severe must be considered at step two and then at step four when
setting the residual functional capacity.   The social security
regulations mandate such consideration and this court has
repeatedly so indicated. See, e.g., Christenson v. Astrue, Civil
No. 10-1192, slip op. at 12 (M.D. Pa. May 18, 2011)(Muir, J.);
Little v. Astrue, Civil No. 10-1626, slip op. at 19-21 (M.D.Pa.
September 14, 2011)(Kosik, J.); Crayton v. Astrue, Civil No. 10-
1265, slip op. at 32-35 (M.D.Pa. September 27, 2011)(Caputo, J.);
Shannon v. Astrue, Civil No. 11-289, slip op. at 39-41 (M.D.Pa.
April 11, 2012)(Rambo, J.); Bell v. Colvin, Civil No. 12-634, slip
op. at 23-24 (M.D.Pa. Dec. 23, 2013)(Nealon, J.); 20 C.F.R. §§
404.1523 and 404.1545(a)(2).

The failure of the administrative law judge to find the above referenced conditions as medically determinable impairments, or to give an adequate explanation for discounting them, makes the administrative law judge's decisions at steps two and four of the sequential evaluation process defective.  The error at step two is a sufficient basis to remand this case to the Commissioner for further proceedings because it calls into question the administrative law judge's assessment of Maillet's residual functional capacity as will be explained in more detail below.

At step three of the sequential evaluation process the administrative law judge found that Maillet's impairments did not individually or in combination meet or equal a listed impairment. Tr. 16-17.

In addressing step four of the sequential evaluation process in her decision, the administrative law judge found that Maillet could not perform any of his past relevant work but that Maillet had the residual functional capacity to perform a limited range of light work[27] but with certain exertional and

---

27.  The terms sedentary, light, medium and heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are
>
> (continued...)

nonexertional limitations. Tr. 17-18. Specifically, the ALJ found

that Maillet was "limited to occupations that can be performed

with use of a cane" and

> require no more than occasional[28] postural maneuvers,
> such as balancing, stooping, kneeling, and climbing on
> ramps and stairs. The claimant must avoid crouching,
> crawling and occupations that require climbing on
> ladders, ropes, and scaffolds.  Further, the claimant is

_____

27.  (...continued)
      met.

    (b) *Light work*.  Light work involves lifting no more
than 20 pounds at a time with frequent lifting or
carrying of objects weighing up to 10 pounds.  Even
though the weight lifted may be very little, a job is
in this category when it requires a good deal of
walking or standing, or when it involves sitting most
of the time with some pushing and pulling of arm or leg
controls.  To be considered capable of performing a
full or wide range of light work, you must have the
ability to do substantially all of these activities.
If someone can do light work, we determine that he or
she can also do sedentary work, unless there are
additional limiting factors such as loss of fine
dexterity or inability to sit for long periods of time.

    (c) *Medium work*.  Medium work involves lifting no more
than 50 pounds at a time with frequent lifting or
carrying of objects weighing up to 25 pounds.  If
someone can do medium work, we determine that he or she
can do sedentary and light work.

    (d) *Heavy work*.  Heavy work involves lifting no more
than 100 pounds at a time with frequent lifting or
carrying of objects weighing up to 50 pounds. If
someone can do heavy work, we determine that he or she
can also do medium, light, and sedentary work.

20 C.F.R. § 404.1567.

28.  "Occasional" under rulings of the Social Security
Administration is defined as up to 1/3 of an 8-hour workday or
approximately 2.67 hours.

> limited to occupations that require no more than
> occasional pushing and pulling with the lower
> extremities to include the operation of foot pedals.
> The claimant must avoid concentrated prolonged exposure
> to the extremes of temperature, dampness, and humidity
> as well as vibrations. He is limited to occupations
> requiring no more than simple, routine tasks, not
> performed in a fast-paced production environment,
> involving only simple, work-related decisions, and in
> general relatively few work place changes. Lastly, the
> claimant is limited to occupations that require low
> stress, defined as occasional decision making required
> and occasional changes in the work setting.

Id. The administrative law judge did not provide any limitations with respect to reaching with the upper extremities and moving the neck or spine side-to-side.

The preference for the treating physician's opinion has been recognized by the Court of Appeals for the Third Circuit and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000). When the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the administrative law judge may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Id. In choosing to reject the evaluation of a treating physician, an administrative law judge may not make speculative inferences from medical reports and may reject treating physician's opinions outright only on the basis of contradictory medical evidence. Id. An administrative law judge may not reject a written medical opinion of a treating physician based on his or her own credibility judgments, speculation or lay opinion. Id. An administrative law judge may not disregard the

medical opinion of a treating or examining physician based solely on his or her own "amorphous impressions, gleaned from the record and from his evaluation of the [claimant]'s credibility." Id. As one court has stated, "Judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor" because "lay intuitions about medical phenomena are often wrong." Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir 1990).

In this case, in rejecting the opinions of Dr. McGinley, the treating physician, and Dr. Shahid, a consultative examiner, the administrative law judge did not give an adequate explanation for doing so and made factual errors as more fully explained below. The administrative law judge engaged in her own lay analysis of the medical records. This was clear error.

In setting the residual functional capacity the administrative law judge rejected the functional assessments of Dr. McGinley and Dr. Shahid and relied on x-ray images that predated Maillet's alleged onset date of June 5, 2008. Tr. 19. In rejecting the opinion of Dr. McGinley, the administrative law judge stated that Dr. McGinley's assessment was not based on any objective findings suggestive of the limitations asserted by Dr. McGinley. This was an erroneous lay interpretation of the medical records. In fact Dr. McGinley noted several objective findings during the time he treated Maillet, including pain elicited over the left and right paraspinal muscles; decreased muscle strength

34

in the left and right upper leg and hip muscles; limited range of motion with respect to extension, flexion and left lateral bending, left rotation, and right rotation; and positive straight leg raising tests bilaterally.

The administrative law judge stated that Dr. Shahid's entire report appeared to be based on the claimant's subjective allegations and that there was no basis "to conclude the level of limitations that included an inability to bend side to side and the claimant dragging his right leg when it was his left leg that he complained about at the hearing." Tr. 20.  The record, however, reveals that Dr. Shahid performed a physical examination, including range of motion testing, which provided objective facts of Maillet's functional abilities.  As noted earlier Dr. Shahid's physical examination revealed that Maillet was markedly limited in his ability to move his neck from side-to-side; strength testing revealed that Maillet's power in the lower extremities was severely impaired; his gait was abnormal; he could not bend forward more than 5 degrees; and his side-to-side movements of the lower spine were severely limited.  In additional the MRI of Maillet's lumbar spine revealed that there was encroachment upon the right neural foramen at the L4/L5 level. The administrative law judge's statement that there was no clinical basis to support Dr. Shahid's assessment was an impermissible lay interpretation of the medical records.  Furthermore, the administrative law judge appears to have failed to recognize that Dr. Shahid completed an

assessment of Maillet's work-related functional abilities.  The
administrative law judge refers to Exhibit 7F which is the
functional assessment completed by Dr. Shahid and states as
follows:

> The third indication in the file with an unclear
> signature again indicating severe limitations is
> entitled to no weight (Exhibit 7F). Similar to
> Dr. McGinley's conclusions of complete restriction
> on postural maneuvers, there simply is no clinical
> support for the conclusion.

(Emphasis added.) The administrative law judge engaged in an
improper lay analysis of the medical records in rejecting the
opinions of Dr. McGinley and Dr. Shahid and failed to recognize
that Dr. Shahid completed a functional assessment.[29]

The error at step two of the sequential evaluation
process is another reason to find the administrative law judge's
residual functional capacity assessment lacking.  That error draws
into question the administrative law judge's assessment of the
credibility of Maillet.  The administrative law judge found that
Maillet's medically determinable impairments could reasonably
cause Maillet's alleged symptoms but that Maillet's statements
concerning the intensity, persistence and limiting effects of
those symptoms were not credible.  This determination by the

---

29.  The Commissioner in his brief acknowledged that Exhibit 7F
was a functional assessment completed by Dr. Shahid. Doc. 10,
Defendant's Brief, p. 9.  Furthermore, anyone who closely
examined Exhibit 7F, the functional assessment, would have
recognized that it was completed by Dr. Shahid because at the top
of the form there is a reference to "Palmerton Medical Assoc PC"
and Dr. Shahid was affiliated with that group. Tr. 260 and 264.

administrative law judge was based on an incomplete and faulty analysis of all of Maillet's medically determinable impairments.

Our review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) vacate the decision of the Commissioner and remand the case to the Commissioner for further proceedings.

An appropriate order will be entered.


 S/ Yvette Kane
Yvette Kane, District Judge
United States District Court


Date: March 11, 2014

37